UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DIANE CANNON,

          Plaintiff,                       Case No. 1:12-CV-42

v.                                           Hon. Robert J. Jonker

CANTEEN SERVICES OF NORTHERN
MICHIGAN, INC., et al,

          Defendants.
_____/

## REPORT AND RECOMMENDATION

          Pending before the court are two motions by the plaintiff (docket nos. 75 and 79) to

reconsider the court's Order of June 28, 2013 (docket no. 54) granting defendant Canteen Services

of Northern Michigan, Inc.'s motion for summary judgment (docket no. 37) and defendants Lake

County and Lake County Sheriff's motion for summary judgment (docket no. 39). Briefs have been

filed in opposition to both motions (docket nos. 83 and 84, respectively).

          In reviewing requests for reconsideration, the court is guided by the local court rule

which provides:

> Generally, and without restricting the discretion of the Court, motions for
> reconsideration which merely present the same issues ruled upon by the Court shall
> not be granted. The movant shall not only demonstrate a palpable defect by which
> the Court and the parties have been mislead, but also show that a different disposition
> of the case must result from the correction thereof.

W.D. Mich. LCivR 7.4(a). A defect is palpable if it is easily perceptible, plain, obvious, readily

visible, noticeable, patent, distinct or manifest. *See Compuware Corp. v. Serena Software*

*International, Inc.*, 77 F. Supp.2d 816, 819 (E.D. Mich. 1999). Plaintiff also bases his motions on

Fed.R.Civ.Proc. 60(b)(1) and (6), which provide that a party may be relieved from an order of the

court for "mistake, inadvertence, surprise or excusable neglect" or for "any other reason that justifies

relief." In relying on this rule, plaintiff assumes the difficult burden of establishing her motion by

clear and convincing evidence. *See Info-Hold, Inc. v. Sound Merch., Inc.,* 538 F.3d 448, 454 (6th

Cir. 2008).[1]

### Motion to Reconsider Dismissal of Claims
### Against Lake County Defendants

In her Second Amended Complaint, plaintiff Diane Cannon (Cannon) alleged that

the two defendants, Canteen Services of Northern Michigan, Inc. (Canteen) on one hand, and

County of Lake, a municipal corporation acting on behalf of the Lake County Sheriff (Lake County

defendants) on the other, were joint employers, who both employed her. Complaint, ¶¶ 2, 3 and 28.

There is no question that Ms. Cannon was an employee of defendant Canteen, but

the Lake County defendants denied she was their employee and the issue was vigorously pursued

in defendants' Motion for Summary Judgment. Defendants Lake County and the Lake County

Sheriff's Motion to Dismiss and/or for Summary Judgment (docket no. 39) at 14-16, and Plaintiff's

Response (docket no. 44) at 13-16. The court found that the "undisputed record amply supports [the

position that Canteen, and not Lake County, employed Ms. Cannon] and contains no evidence to the

contrary." *See* Opinion and Order, June 28, 2013 at 4. In fact, the formal contract entered into by

Canteen and the Lake County defendants, and referred to by the Court in its Opinion, unequivocally

---

[1]Lake County defendants mis-cite this case "548 F.3d" in their brief at 2, n.2 (docket no. 84).

spelled out the relationship between plaintiff as an employee of Canteen, and the Lake County defendants.

> XIV. **Independent Contractor.** It is expressly understood and agreed that the Contractor [i.e. Canteen] is an independent contractor. The employees, agents and subcontractors of the Contractor shall in no way be deemed to be and shall not hold themselves out as the employees, servants and agents of the County or the Sheriff. The Contractor's employees, agents and subcontractors shall not be entitled to any fringe benefits of the County such as, but as not limited to, health and accident insurance, life insurance, paid vacation and/or sick leave or longevity. The Contractor shall be responsible for payment of all compensation due and owing its officers, employees, agents and subcontractors for services they have performed under this Contract and for the withholding and payment of all applicable taxes, including, but not limited to, income and Social Security taxes to the proper Federal, State and local government. The Contractor shall carry worker's disability compensation insurance coverage for its employees, as required by law.

Food Services Contract, ¶XIV. The Court then went on to detail evidence from the record supporting this finding, noting in conclusion that Ms. Cannon in her own deposition acknowledged that Canteen was her employer. The Court could find no evidence that Lake County employed Ms. Cannon, jointly or otherwise.

A review of the evidence put before the Court describes a scenario common to many high security facilities (jails, courthouses, government research labs, etc.), which hire independent contractors to provide cleaning crews, food service, or even security itself. The independent contractor will provide, supervise and pay the personnel performing the work, but the facility will always be able to bar any individual employed by that contractor from its premises that it perceives to be a risk. No one maintains these individuals are employees of the facility.

In her Motion for Reconsideration, Ms. Cannon can only prevail if she can show that the Lake County defendants are covered by the joint employer doctrine, as she alleged in her complaint.

Plaintiff did file a response to the Lake County defendants' Motion for Summary Judgment, contending that although she was employee of defendant Canteen, this did not "preclude the plaintiff from also being an employee of Lake County and the Sheriff of Lake County at the same time." Plaintiff's Response and Brief to Defendant's Motion for Summary Judgment and Dismissal (docket no. 44) at 13. Plaintiff did not contend that she was actually employed by the Lake County defendants, but rather that the relationship between Canteen and the Lake County defendants was such that the jurors could find from the legal and contractual responsibilities of the two entities that both defendants could be treated as "joint employers" of the plaintiff.

Unfortunately, plaintiff attempted to liken the "Canteen/Lake County arrangement" to a staffing arrangement, with Canteen as the putative temporary employment agency, which places individuals in temporary jobs at its clients' places of business. The agency recruits, screens, hires and trains the employees, sets and pays the wages when the worker is placed in a job assignment, withholds taxes and social security, and provides workers' compensation coverage. The agency bills the client for the services performed. While the worker is on a temporary job assignment, the client typically controls the individual's working conditions, supervises the individual, and determines the length of the assignment. *Id.* at p. 14.

Not only does this argument fly directly in the face of the contractual arrangement between Canteen and the Lake City defendants spelled out above, but the EEOC, after investigating the matter, explicitly stated that plaintiff was "not an employee of respondent," but rather "worked at its' [sic] facility as an independent contractor." EEOC Letter to Ms. Cannon, October 11, 2011.

Indeed, Canteen's relationship to the Lake County defendants as an independent contractor is borne out and well explained in detail in the affidavit of Canteen's general manager,

4

Robert Oliverius, which is attached as Exhibit 5 to plaintiff's Motion for Reconsideration of the order dismissing the Lake County defendants (docket no. 79), and was cited by the Court in its order. The affidavit highlights the relationship between the plaintiff and the defendants, by pointing out that Ms. Cannon was one of nine Canteen employees whose access to customer facilities had been revoked, but that she was offered an opportunity to transfer to another facility where Canteen had a contract. Ms. Cannon refused to transfer because the other facility was in an adjacent county and she felt it was too far to drive. The cessation of her employment at the Lake County facility did not necessarily mean the end of her employment with Canteen, thus underscoring her status as an employee of Canteen and not the county jail. The Court was justified in paying little attention to her "joint employer" argument, as she structured it.

That said, I find there is nevertheless a legitimate "joint employer" theory to be considered under the facts of this case, notwithstanding that plaintiff was employed by Canteen and Canteen was an independent contractor.

The joint employer doctrine was recognized by the Supreme Court in *Boise Greyhound Corp.,* 376 U.S. 473 (1964), and has been clearly articulated in this circuit since the Sixth Circuit's decision in *Swallows v. Barnes & Noble Bookstores, Inc.,* 128 F.3d 990 (6th Cir.1997). The Court in *Swallows* began by noting that in instances where an employee might be answerable to more than one entity, duel concepts such as the "single employer" and the "joint employer" had arisen. The Court stated:

> Both the "single employer" and "joint employer" concepts developed in the labor relations context, *see Radio & Television Broad. Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed 2d 789 (1965) (per curiam)(single employer); *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) (joint employer), and were subsequently

imported into the civil rights context.  *See Armbruster v. Quinn,* 711 F.2d 1332, 1336-37 (6th Cir. 1983).  Thus, we look to both labor cases and civil rights cases for guidance.  *See Rivas,* 929 F.2d at 820 n. 15.

*Swallows, supra,* at n.3.  The Sixth Circuit went on to observe:

As other Courts have explained, however, these concepts are analytically distinct.  *See Virgo v. Riviera Beach Assoc., Ltd.*, 30 F.3d 1350, 1360 n. 6 (11th Cir.1994); *Rivas*, 929 F.2d at 820 n. 16; *NLRB v. Western Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir.1987); *Clinton's Ditch Coop. Co., Inc. v. NLRB*, 778 F.2d 132, 137 (2d Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); *NLRB v. Browning-Ferris Ind. of Pennsylvania, Inc.*, 691 F.2d 1117, 1122-23 (3d Cir.1982); *Magnuson v. Peak Technical Servs., Inc.*, 808 F.Supp. 500, 508-510 (E.D. Va.1992).  While the single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise, the joint employer analysis has been described as follows:

> **The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.  Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.** (emphasis added)

*Browning-Ferris*, 691 F.2d at 1123 (citations omitted).  *See also EEOC v. Regency Windsor Management Co.*, 862 F.Supp. 189, 191 (W.D. Mich.1994).  Because plaintiffs have never raised the question of whether TTU and Barnes & Noble acted as their "joint employer," we do not address the merits of such a claim here.

*Swallows, supra,* at n. 4.[2]

Here, plaintiff seeks to hold the Lake County defendants responsible as a joint

employer, despite burying her argument in a confusing set of improvidently filed briefs.[3]

Regardless, whether Lake County exercised sufficient control over plaintiff to constitute it a joint

employer for some or all purposes is a factual determination requiring the Court to consider such

factors as authority to hire, fire and discipline her; promulgation of work rules and conditions of

employment; issuance of work assignments and instructions; and supervision of her day-to-day

activities. Whether the Lake County defendants exercised sufficient control to be deemed a joint

---

[2]This was unfortunate because the situation in *Swallows* was somewhat analogous to the present case. Barnes & Noble was an independent contractor which contracted with Tennessee Technological University ("TTU") to operate and manage a bookstore on TTU's campus. It was undisputed that Barnes & Noble, not TTU, was plaintiffs' direct employer, but when plaintiffs were discharged, they sought to hold TTU responsible as an employer as well. Unfortunately for our purposes, since plaintiffs pursued the "single employer" theory, rather than the "joint employer" theory, the Court had no occasion to explore the parameters of the latter.

[3]Plaintiff's brief in support of her Motion for Reconsideration of the order dismissing the Lake County defendants (docket no. 79) does not actually discuss her "Joint Employer" argument at all. Rather, plaintiff simply lists in paragraph eight other documents (including two briefs totaling 50 pages) she has filed in response to other motions in this case, which plaintiff believes will persuade the Court of the merits of her position on this motion as well. Plaintiff's Brief at 2-3. Putting aside the absurdity of this approach as an advocacy tool, it violates every possible limitation the court has on the length of briefs a litigant is entitled to file. *See, e.g.,* W.D. Mich. LCiv R 7.1 and 7.2. Indeed, plaintiff also incorporates by reference into her brief the very Motion for Reconsideration (docket no. 79) the brief itself is supposed to support. This paragraph, in its entirety, is set forth below:

> Consequently, the Plaintiff will incorporate by reference the
> Lake County Motion for Reconsideration, Plaintiff's Response to First
> Canteen Motion for Sanctions, *Doc. #55, 57,* 57 [sic] Plaintiff's
> Response to the Canteen's Second Motion for Sanctions, *Doc.* #72, 73,
> and the Plaintiff's Response to Lake County's Motion for Sanctions,
> *Doc.* #63, 64, 65. The Plaintiff relies on these pleadings [sic] to prove
> that the Canteen was the plaintiff's "formal employer" and that Lake
> County was the Title VII "as if" it were the Plaintiff's employer for the
> purposes of the Title VII liability.

Finally, plaintiff uses the identical language in her other Motion for Reconsideration of the order dismissing the Canteen defendant (docket no. 75).

employer is a question for the trier of fact. *Equal Employment Opportunity Comm. v. Regency Windsor Management Co.,* 862 F.Supp. 189, 191 (W.D. Mich. 1994); *see, Boire v. Greyhound Corp.,* 376 U.S. 473, 481 (1964) (whether a company exercises such control as to be considered a joint employer is a factual issue). *See also, Carrier Corporation v. National Labor Relations Bd.,* 768 F.2d 778, 781 (6th Cir. 1985), citing *NLRB v. Browning-Ferris Industries of Pennsylvia, Inc.,* 691 F.2d 1117, 1124 (3rd Cir. 1982) ("where two or more employers exert significant control over the same employees – where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment – they constitute 'joint employers' within the meaning of the NLRB.").

There is no question here that Ms. Cannon ceased working at the county facility because of actions taken by the Jail Administrator, David Dagen, as this court noted in its Opinion of June 28, 2013. On October 15, 2010, Mr. Dagen sent an email to Mr. Oliverius, Canteen's general manager, with various complaints about plaintiff's job performance, including one about delays of 20 to 30 minutes at meal time caused by plaintiff's inability to handle special diet trays. He concluded by stating, "I do not want her back." In his deposition, in response to a question by plaintiff's counsel as to whether he knew that as a result of the email he had sent to Mr. Oliverius, plaintiff would not be performing any more services for Canteen Services, Mr. Dagen testified:

"A. She would no longer be allowed within the facility."

Dagen Dep. at 38. Asked, if that was his intent, why didn't he put that into his email, Dagen replied:

"I believe my intent is there when I said, 'I do not want her back.'"

*Id.* at 38-39. Asked the reasons for not wanting plaintiff back, Dagen made it clear in his testimony that he was concerned with constant issues of food service which were being reported to him

involving Ms. Cannon, including preparation of special diet trays, a prisoner who said plaintiff

shoved him, and plaintiff snatching utensils out of a prisoner's hands. *Id.* at 40-41.

On the other hand, the jail administrator made it clear that the issue of security had

nothing to do with his not wanting Ms. Cannon back.

Plaintiff's Counsel:  Okay.  Would you agree that nowhere in that email
did you ever talk about a security risk?

A.     Correct.

Q.     At some point in time the issue of security risk was raised, regarding
her separation.

 [objection by opposing counsel as to form and foundation]

Plaintiff's Counsel:  Would you read the question back, please?

COURT REPORTER:     Just a moment.

(Off the record for playback)

(On the record)

Plaintiff's counsel:  Do you understand the question?

A.     Yes

Q.     All right.  Can you answer the question?

A.     Security risk never came out of my mouth at all.

Q.     So are you saying that the issues that you raised in this
letter (sic) are the issues why you did not want her back?

A.     Yes.

Q.     No other reasons?

A.     When you have constant issues with food service,
yes, there is a problem.

*Id.* at 39-40.

The Sheriff (or presumably the jail administrator acting on behalf of the Sheriff) had the authority under the county's contract with the independent contractor, Canteen, to bar plaintiff from the facility if they believed her to be a security risk. *See* Food Services Contract at Part III.D. But Mr. Dagen's actions and testimony constituted persuasive evidence he barred her for other reasons in this instance, and that security concerns played no role. Instead, they simply decided to terminate plaintiff's employment at their facility based on her work performance, which, as a practical matter, any sheriff or jail administrator can do, because they have an inherent authority to regulate access to their jail facility.

In doing so, it could be argued, and plaintiff does argue, that the Lake County defendants were disciplining Ms. Cannon, which is the function of an employer. Canteen, as her formal employer, unquestionably could discipline her if she displayed a careless, inefficient or unsatisfactory performance of her work responsibilities or duties, or conducted herself in any other way in which management, in its sole discretion, deemed to be inappropriate to the well being of the Company's operations or reflected poorly on the Company's business image. Canteen Employee Handbook, Part XVIII, ¶¶18, 23. But here, it was the Lake County defendants determining the need for corrective action, and taking that action, not Canteen.

It is perhaps significant that the Lake County defendants, unhappy with the performance of an employee of their independent contractor, do not appear to have asked Canteen to handle the situation, but rather took matters directly into their own hands, by terminating plaintiff's continued employment at that work site. Because they were the "keeper of the keys," they had a particularly quick and effective way of shutting off plaintiff's access to the facility. But in

electing to act on their own, arguably for reasons of plaintiff's allegedly poor performance, did they thereby step into the shoes of the employer?

It can certainly be argued by the defendants that in most respects, the Lake County defendants did not stand in the shoes of an employer vis-a-vis plaintiff, as the Court has already found in its Opinion and Order, *supra,* although there may be some gray areas as far as her duties were concerned, which was not discussed. But does the "joint employer" doctrine require that one be a *de facto* employer in all respects for the theory to apply, or is the "joint employer" going to be held to the standards of an employer only where the questions of wrong-doing intersect, or touch upon, the areas where the defendant acted in the role of an employer? For example, if the theory were limited to the latter, which would make sense, plaintiff would have no grounds for alleging racial discrimination against the Lake County defendants in her wages or promotion, since there is no suggestion the County acted as a joint employer in these respects, but the Lake County defendants might be liable if they acted like an employer in disciplining her and if the reason they disciplined her, by terminating her from her employment at the jail, was really based on racial discrimination rather than poor performance.

For the reasons discussed above, I find the claim of joint employer liability, as properly construed, viable in this case. Whether the Lake County defendants exercised sufficient control to be deemed a joint employer, however, is a question for the trier of fact, particularly where, as here, there appear to be genuine issues of material fact outstanding. This issue was not addressed nor ruled upon by the Court because the theory of joint employer liability previously raised was entirely different. I find the correct theory of joint employer liability remains to be addressed, and that a proper construction of that theory requires a disposition of the case at this time other than

summary dismissal.  *See* W.D. Mich. LCiv R 7.4.  Since the Motion for Summary Judgment in favor

of the Lake County defendants was essentially granted on the sole basis that there was no evidence

the Lake County defendants directly employed plaintiff, I respectfully recommend that the Motion

to Reconsider the Court's Order and Opinion of June 28, 2013 dismissing the claims against the

Lake County defendants (docket no. 79) be **GRANTED,** and that the dismissal of the claims against

the Lake County defendants be set aside.


## Motion to Reconsider Dismissal of Canteen

Plaintiff has also filed a motion to have the Court reconsider its order dismissing her

claims against Canteen Services (docket no. 75).  Other than the introductory sentence identifying

the motion, its five-paragraph text is identical to plaintiff's Motion to Reconsider the dismissal of

the  Lake County defendants (docket no. 79), discussed *supra*.  Essentially, the basis of the motion,

when one reads both the motion and the brief, is that the Court neither addressed nor considered

plaintiff's claim of a hostile work environment.  This was, it is alleged, because defendants had

contended plaintiff was terminated by the acts of the Lake County defendants and therefore Canteen

had a legitimate non-discriminatory reason for letting the plaintiff go, that being that Lake County

had withdrawn her security clearance which was an adverse employment decision not made by

Canteen.  For the reasons discussed below, I find that plaintiff set forth a separate claim of a hostile

work environment in her complaint, which arguably has some support in the record, and this claim

was not addressed by the Court in its June 28, 2013 Opinion and Order.[4]

---

[4]Canteen adroitly downplays plaintiff's hostile work environment claim in its summary judgment
motion. Rather than acknowledge that plaintiff has filed a "hostile work environment claim," Cannon
simply refers to it as "some claim based on . . . alleged name calling."  Cannon's Brief (docket no. 38) at
23.  Then Canteen states that this alleged name calling cannot give rise to any claim because plaintiff did

12

not suffer any adverse employment action attributable to it, and that an adverse employment action is a necessary element of any employment discrimination claim. Canteen cites *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 595-96 (6th Cir. 2007), for the proposition that "adverse employment action" is a materially adverse change in the terms and conditions of employment and includes termination, demotion, being given a less distinguished title, suffering a material loss of benefits, or being given diminished material responsibilities. Canteen might better have cited from page 600 of the opinion, which sets out the definition of a hostile work environment:

> **D.     Hostile Work Environment.** Michael's final claim asserts that Caterpillar's actions created a hostile work environment. To establish a hostile-work-environment claim, Michael must show that "(1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions." *Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 605 (6th Cir. 2002) abrogated on other grounds by *White v. Columbus Metro Hous. Auth.,* 429 F.3d 232 (6th Cir. 2005). Actionable harassment arises where "the work place is permeated with discriminatory intimidation, ridicule and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (alterations in original) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

This classic definition of a hostile work environment is discussed below in this report. Plaintiff need only show that the work place is so permeated with discriminatory intimidation, ridicule and insult that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Defendant also asserted in its motion that plaintiff never raised this claim in her EEOC charge and therefore it was subject to dismissal for lack of subject matter jurisdiction. *Strous v. Michigan Dept. of Corrections,* 250 F.3d 336, 342 (6th Cir. 2001) ("it is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge."); *Weigel v. Baptist Hospital of East Tennessee,* 302 F.3d 367, 380 (6th Cir. 2002) (a plaintiff's complaint filed in the district court must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge). While it might be argued that plaintiff's claim of a hostile work environment could reasonably have been expected to grow out of the detailed list of run-ins plaintiff describes to the EEOC she had while at the jail facility, plaintiff unfortunately did not choose to answer defendants' argument until she filed her Motion for Reconsideration.

In her brief in support of her Motion for Reconsideration at 18, plaintiff states that in paragraph 8 of her Second Amended Complaint she alleged, "The plaintiff has exhausted all of her remedies through the Equal Employment Opportunity Commission," and that defendant "Admitted" the same in its "ANSWER," and refers to "Doc. #8 Filed 05/29/12 Page 1 of 16." Plaintiff apparently contends this admission is a judicial admission binding on defendant. *See, Keller v. United States,* 58 F.3d 1194, 1199

Racial harassment can constitute a violation of Title VII. To be actionable, it must be so severe or pervasive as to alter the conditions of employment and create an abusive working environment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). Hostile work environmental claims based on racial harassment are reviewed under the same standard as those based on sexual harassment. *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 116, n. 10 (2002, citing *Faragher, supra.* Generally speaking, the extent to which the harassment must be severe or pervasive seems to be inversely proportional to how particularly invidious are the racial epithets or the acts of racial sensitivity. *See, e.g., Pavon v. Swift Transp. Co.,* 192 F.3d 902 (9th Cir. 1999) (affirming jury verdict in case where racial insults by co-worker, unabated by employer, were near-daily occurrence; *Jackson v. Quanex Corp.,* 191 F.3d 647 (6th Cir. 1999) (reversing judgment

---

at n. 8 (7th Cir. 1995) (judicial admissions are formal concessions in the pleadings by a party or its counsel that are binding on the party making them; they are conclusive and may not be converted at trial*); Ferguson v. Neighborhood Housing Services of Cleveland, Inc.,* 780 F.2d 549 (6th Cir. 1986) (judicial admissions eliminate the need for evidence on the subject of the admission and once made, the subject matter of the admission should not be reopened in the absence of a showing of exceptional circumstances); *Bellefonte Ray Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528-29 (2nd Cir. 1985). Thus, it has been said that "[a] judicial admission trumps evidence," giving rise to the principle that "a plaintiff can plead himself out of court." *Murrey v. United States,* 73 F.3d 1448, 1455 (7th Cir. 1996).

Canteen does not take issue with this admission. The Court notes, however, that Doc. #8 was an ANSWER to plaintiff's original Complaint, which was superseded by plaintiff's Second Amended Complaint. In its answer to paragraph 8 of plaintiff's Second Amended Complaint, that she had exhausted all of her remedies through the Equal Employment Opportunity Commission, Canteen gives a different response, stating that paragraph 8 is "[n]either admitted nor denied as Defendant Canteen is without knowledge or information sufficient to form a belief or opinion as to the truth of the allegation in Paragraph 8." Whether the fact that plaintiff was allowed to file a Second Amended Complaint for other purposes, which supplanted her original complaint and amended complaint, also allowed Canteen to, in effect, withdraw its judicial admission, is an interesting point, but neither side has raised it.

Finally, plaintiff also points out in her Motion to Reconsider that Canteen did not raise any affirmative defense to plaintiff's assertion that she had exhausted her EEOC remedies, and therefore that defense was waived for that reason as well. Canteen has not responded to this argument either.

as matter of law for employer in case alleging campaign of racial slurs, physical threats and sabotage against African-American employees); *Harrison v. Metropolitan Gov't of Nashville & Davidson County,* 80 F.3d 1107, 1118 (6th Cir. 1996) (employee subjected to racial incidents could not show hostile environment, despite his testimony of stress and sleeplessness, because he did not show the incidents affected his work performance); *Jackson v. Flint Ink N. Am. Corp.,* 370 F.3d 791, 795-96 (8th Cir. 2004) (holding that "six isolated instances of racially derogatory language from two managers and three co-workers over the course of a year and a half" was not a "steady barrage of opprobrious racial comment" sufficient to make out a racial harassment claim).

Hostile work environment claims are different from discrete acts because their very nature involves repeated conduct. *National Railroad, supra,* at 115. The repeated nature of the harassment or its intensity may constitute evidence that management knew or should have known of its existence, and the unlawful employment practice therefore cannot be said to occur on any particular day. Rather, it occurs over a series of days or perhaps longer. *See National Railroad, supra,* at 115. It is not the mere utterance of a epithet which engenders offensive feelings that affects the conditions of employment sufficient to implicate Title VII; such claims are based on the cumulative effect of individual acts. On the other hand, the scope of the prohibition is not limited to economic or tangible discrimination, and it covers more than terms and conditions in the narrow contractual sense. Workplace conduct is not measured in isolation. Where the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment, and create an abusive working environment, Title VII is violated. *National Railroad* at 115-116.

In determining whether an actionable hostile work environmental claim exists, the court looks at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). *Id.* at 116-117.

Plaintiff's Second Amended Complaint (docket no. 22) is repleat with references to the issue of a hostile work environment. The complaint, *inter alia,* states that plaintiff complained to her immediate supervisor at Canteen about the discrimination she was experiencing at the facility, and that this discriminatory treatment came from all sides. She alleges that certain deputies, inmates and other county employees "created a racially discriminatory hostile environment" and that other Canteen and Lake County employees were aware of the "hostile environment" and failed to [take] prompt remedial and effective action to end it. Complaint, ¶ 24. Her immediate supervisor told her she did not know how plaintiff had "slipped through the cracks" because there were other black applicants who could not get jobs at the facility because of their color. Complaint, ¶ 30(a). Her supervisor also told her that [jail administrator] David Dagen, a white male, would look through all of the applications and discard the ones that were from black applicants. Complaint, ¶ 30(b). She alleges that similarly situated individuals (all of whom were white) were not required to meet the performance standards set for plaintiff, Complaint, ¶ 32, and plaintiff was singled out for closer job performance scrutiny than any other similarly situated employee outside of the protected class without legitimate justification. Complaint, ¶ 34-35. Canteen "supervisors and co-workers created an intimidating, hostile and offensive work environment, and supervision knew or should have

known about the alleged harassment and did not take prompt remedial action." Complaint, ¶ 36. The employer administered discipline that was more severe than that administered for similar and more egregious conduct engaged in by similarly situated employees outside the protected class. *Id.*, ¶ 38. "That the implementation of the defendants' procedures, policies, unwelcome treatment, conduct and/or communications were intended to, and/or in fact did, substantially interfere with the plaintiff's employment and created an intimidating, hostile and offensive work environment from her date of hire until her termination." *Id.* at ¶ 42. The defendants' employees who created "a hostile environment surrounding the Plaintiff," were not limited to the individuals named in the Complaint. *Id.* at 44. The less favorable "discriminatory treatment created a 'hostile environment' which was severe, pervasive, frequent, unwelcome, intimidating and involved comments and conduct of an offensive nature such that it adversely effected [sic] the plaintiff's terms of employment." *Id.* at ¶ 45. "Plaintiff's race was a factor that made a difference in defendant's decision to subject her to the wrongful and discriminatory treatment including but not limited to her termination and a hostile environment during her entire employment with them." *Id.* at 52.[5]

Thus, it is readily apparent that plaintiff has alleged in her complaint that her work place was permeated by racial intimidation, ridicule and insults from the beginning of her employment. It is also apparent from reading her complaint that she believed others interfered with her ability to perform her duties because of her race. Although plaintiff may not have to show economic or tangible discrimination to prevail on her Title VII claim of a discriminatory hostile working environment, *see discussion, infra,* the fact is, the reason given for her termination from the

---

[5]This paragraph 52 should actually be number 54 of the Second Amended Complaint. This is a typographical error in the document.

facility was poor work performance. If she can show she was fired because of poor work performance, which in turn was caused by the interference of others because of her race, this would add one more string to her bow, in addition to the claim that the work place was so permeated with discriminatory intimidation, ridicule and insult that it was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment. *See National Railroad* at 116.

Next is the question of whether there is significant probative evidence supporting Ms. Cannon's hostile work place complaint. *See, e.g., Copeland v. Machulis,* 57 F.3d 476, 478-79 (6th Cir. 1995). Plaintiff Diane Cannon gave her sworn deposition on February 27, 2013. It is the only competent testimony provided by plaintiff herself presently before the Court.[6]

While there are, not surprisingly, inconsistencies in plaintiff's testimony, there is a substantial amount of testimony underscoring plaintiff's claim that her work place at the jail was permeated with discriminatory ridicule and insult. There is also testimony that others interfered with her ability to do her job because of her race. Whether plaintiff is credible and whether her testimony convincingly paints a picture that is sufficiently severe or pervasive to the extent her condition of employment was altered and an abusive working environment was created, are issues for another

---

[6]In its June 28, 2013 Order, the Court found that plaintiff improperly submitted an unsigned affidavit in opposition to Canteen's Motion for Summary Judgment. The affidavit also contradicted admissions made in plaintiff's deposition without providing any justification for doing so. Plaintiff belatedly signed her affidavit on July 11, 2013, two months after submitting her answer to the Motion for Summary Judgment, and only after the Court had issued its June 28, 2013, Opinion and Order.

In support of her Motion for Reconsideration, plaintiff filed another declaration, providing additional facts about her employment and this litigation. The motion pending before the Court is one to reconsider a previous motion, which was decided upon a body of facts then before the Court. A motion to reconsider is not an opportunity to re-litigate the motion for summary judgment on a new set of facts. *See Aero-Motive Company v. Great American Insurance,* 302 F.Supp. 2d 738, 740 (W.D. Mich. 2003).

Accordingly, I have not considered any of these three documents since none of them were properly before the Court when it made its prior ruling.

day.  The immediate question is whether or not her testimony gives rise to significant probative and material facts to support a claim.  Excerpts from plaintiff's deposition are discussed below.

The first excerpt below was highlighted in defendant's brief and subsequently relied upon by the Court in its Opinion.

Q. (by defendants' attorney):  And nobody at Canteen Services ever said to you about your race or age or anything about like that, did they?

A.  No.

Q.  And so, you never made any complaints to anyone at Canteen Service about anyone saying racial things to you or things about age or anything like that, did you?

A.  No.

See Defendants' Brief (docket no. 38) at 11.  Notwithstanding that quote, however, Ms. Cannon goes on almost immediately in her deposition, as follows:

THE WITNESS:  Yes, I spoke to Pam and her job was to take it to Canteen.

Q. (by defense counsel):  Pam was a Canteen employee; right?

A.  Yes.

Q.  And what I asked you if you ever spoke to anybody at Canteen about race?

A.  No.

Q.  And your answer is, I did not speak to anyone at Canteen about racial issues?

A.  No one directly, no.

Q.  No one at Canteen?

A.  Yes, I spoke to Pam.

Q.        And what did you tell Pam then?

A.        If anyone said anything to me derogatory I would tell
          Pam.

Q.        When did you tell Pam these things?

A.        When did I tell her these things?  I didn't hear you, sir.

Q.        Yeah.

A.        I would tell her every time it would happen.

Plaintiff's Dep. at 57-58.  This establishes that Ms. Cannon told Pam, who was her supervisor,

whenever anyone would say derogatory things to her, which happened on more than one occasion.

Ms. Cannon goes on:

Q.        Who would say derogatory things to you?

A.        The prisoners would say derogatory things to me.  Kat.[7] Well,
          she said it all the time.  Char,[8] she would say derogatory
          things about me.

Q.        What did Char say?

A.        Char's famous word was nigger.

Q.        I don't understand?

A.        Char's famous word was nigger.

      MR. WRIGHT:        Famous word?
      THE WITNESS:        Yes, she loved to say the word nigger.

BY MR. RYAN:

Q.        Who would she say that to?

---

[7] A Canteen line cook like plaintiff – *see* Plaintiff's Dep. at 12-13

[8] A Canteen line cook like plaintiff – *see* Plaintiff's Dept. at 12-13.

| A. | She would say it to the prisoners. |

*Id.* at 58.

. . . .

| Q. | What did you tell Pam about these things? |
| A. | I told Pam what they would, what they called me. |
| Q. | So, you told Pam and Char called you a . . . |
| A. | . . . nigger |

*Id.* at 59. This establishes what Ms. Cannon told her supervisor her fellow Canteen employee(s) were saying about her.

In Canteen's reply brief in support of their Motion for Summary Judgment (docket no. 48 at 9), Canteen states that Pam testified that plaintiff never informed her about her co-workers whispering the name "nigger" in reference to her. This would certainly suggest a question of fact.

Plaintiff goes on:

| Q. (by defense counsel): | I want every time it happened. |
| A. | When the prisoners and Kat and them would get together and I was working and they would, shhh, whisper, but they would whisper loudly so I can hear them. I would tell Pam about it. When Judy. |
| Q. | Now I want to go back, this whispering thing, when did that happen? |
| A. | It happened when I was in the kitchen working. |
| Q. | I know, but you worked every day, did it happen every day? |
| A. | It happened almost every day. |
| Q. | All right. And did you hear what the whisperings were? |

A.	Yes.

Q.	And what were the whisperings?

A.	The whispering was that the nigger doesn't know what
	she's doing.

Q.	And who said that, the prisoners?

A.	The prisoners and Kat mostly, and Char.

Q.	Okay. Did you, can you tell me that you heard Char say that?

A.	Yes.

Q.	And she said exactly that, what you just told me?

A.	Yes.

Q.	And the prisoner said exactly the same thing too?

A.	And the prisoner said exactly the same thing.

Q.	Everybody said exactly the same thing?

A.	The nigger doesn't know what she's doing, you know, it was
	a joke.

Q.	What did you tell Pam?

A.	I told Pam that my name is nigger.

Q.	You told Pam that that's your nickname?

A.	I told Pam, I said you know what, I have a new nickname.
	And she said what. I said nigger. And she said what. And
	I said nigger.

Q.	And then what did Pam say?

A.	And she said who called you that. And then I would tell her.

Q.	And what did you tell her?

A.      I told her that Char and Kat and the prisoners would be whispering loud enough for me to hear them while we were working, and that's what they would call me.

Q.      And then what did Pam say?

A.      Pam said that we were going to put a stop to this.

Q.      Okay. And how long into your employment did that happen?

A.      It happened really almost, it happened really, it happened almost to the eternity of my employment, because.

Q.      You told me about one conversation you had with Pam?

A.      Yes.

Q.      And in that conversation you told Pam about these whispering conversations?

A.      Yes.

Q.      And Pam told you we'll put a stop to it?

A.      But it didn't stop.

Q.      I'm not asking you if it stopped now or not. I am asking you when that conversation with Pam occurred?

A.      Every time it would happen.

*Id.* at 60-62. All of this sworn testimony is direct evidence going to the issue of discriminatory ridicule and insult, as well as the frequency of such conduct, whether it was humiliating and how pervasive it was.

The plaintiff also described at length the difficulty she had with the employees who directed her on the preparation of the food trays. She was asked whether, when she was talking

23

about things that happened every day to her, did she mean literally every day or were there certain

days that things didn't happen.  Her answer was:

    A.                 I meant it every day.
                         . . . .

    THE WITNESS:       Or did I understand your question?  I am very serious, did I
                                  understand your question?

    Q. (by plaintiff's counsel):       It's all right.

    A.                 They did me wrong every day.  If I didn't answer it that
                                  way, I understand your question.

    Q.                 Was there ever a day that nothing happened when you
                                  worked there that was discriminatory?

    A.                 No.

[objections]

    Q.                 It was that bad?

    A.                 Yes.

*Id.* at 152-153.

       Plaintiff's attorney also asked her about how often she spoke to Pam Bowers.

    Q. (by plaintiff's counsel):    Did you complain to Pam Bowers about
                                   inmates and coworkers calling you names?

    A.                 Yes, yes.

    Q.                 Did you tell her what the names were?

    A.                 Yes.

    Q.                 Did you tell her about it on more than one occasion?

    A.                 Yes.

    Q.                 Can you give us some idea of the frequency that you spoke

to Pam Bowers about what they were whispering?

[objections]

THE WITNESS:        Yes.  Every day.

*Id.* at 154-155.

. . . .

Q. (by plaintiff's counsel):        When you were listing the things that you
felt were conduct that was treating you less
favorably than the other line cook, were the
offending deputies or inmates doing the same
thing to the white line cooks?

[objection]

THE WITNESS:            No.

*Id.* at 155.  Thus, contrary to what Canteen has argued, the bulk of Ms. Cannon's sworn deposition

testimony was that she had been subject to a racially hostile work environment, and had reported

the same to her supervisor, on a daily basis.

The Court's Opinion and Order focused on plaintiff's termination from the jail

facility, but did not address plaintiff's allegation that during her time there she was subjected to a

hostile work environment, in which she was subjected to discrimination, ridicule and humiliation

over a substantial period of time, by both co-workers from Canteen as well as County employees

and prisoners.  She testified she repeatedly reported this to her supervisor, but to no avail.

I believe Ms. Cannon has adequately raised the issue of a hostile work environment

in her complaint, and that her deposition testimony alone provides enough of a factual basis to create

a genuine issue of material fact.  I do not believe the Court addressed this claim in its Opinion and

Order.  Accordingly, I respectfully recommend the Motion for Reconsideration (docket no. 75) be

**GRANTED**, and the dismissal against Canteen set aside in so far as plaintiff's claim of a hostile work environment is concerned, and that Canteen's Motion for Summary Judgment be deemed Denied as to that claim. I recommend that all other claims against this defendant in the complaint remain Dismissed.


Dated: March 26, 2014                    /s/ Hugh W. Brenneman, Jr.
                                         HUGH W. BRENNEMAN, JR.
                                         United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).