UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE CANNON,

               Plaintiff,                             Case No. 1:12-cv-42

v.                                           Hon. Robert J. Jonker

CANTEEN SERVICES OF
NORTHERN MI, INC., et al,

               Defendants.

_____/

## REPORT AND RECOMMENDATION

Both defendants Canteen Services of Northern Michigan, Inc. (Canteen) and Lake County Correctional Facility (Lake County) have filed renewed motions for summary judgment and to dismiss for failure to state a claim (docket nos. 115 and 117, respectively). Both motions are opposed.

## Background Summary

Plaintiff was a line cook hired by Canteen in July 2010 as part of the staff that Canteen, an independent contractor, assigned to work at co-defendant Lake County's RRP facility. She was employed by Canteen at the correctional facility until October 16, 2010, when Lake County revoked her access to its facility and she could no longer continue to work there. Canteen claims plaintiff refused a subsequent offer by Canteen to be placed in an unrelated facility because of its location. Plaintiff subsequently filed this action alleging she had been discharged on the basis of her race. Following the filing of two amended complaints, including her Second Amended Complaint on October 9, 2012 (docket no. 22), which became the governing complaint in this action,

1

and some preliminary motion practice and discovery, the Court granted each defendant summary judgment on June 28, 2013 (docket no. 54).

On September 30, 2013, plaintiff moved for reconsideration (docket no. 75) and the motion was referred to the undersigned for a Report and Recommendation. The Report recommended that the summary judgments in favor of the defendants be set aside so that the theories of joint employer liability as to Lake County and racial discrimination, based on a racially hostile work environment, as to one or both of the defendants, could be adequately addressed. The undersigned found upon close examination of the record that both of these claims had been sufficiently raised by plaintiff so that it could fairly be said these claims were before the Court, but otherwise so poorly articulated or ignored by the parties that the Court had never had the opportunity to consider them.[1] In affirming the magistrate judge's Report and Recommendation, the Court very succinctly stated the parameters of the case going forward:

> [T]he Court clarifies its earlier order of summary judgment to leave in place the two potential claims framed by the Magistrate Judge: namely, 1) a claim that Lake County is a joint employer under the theory outlined by the Report and Recommendation, not the original theory briefed by the plaintiff; and 2) a claim that one or both defendants is liable for racial discrimination on a theory of a racially hostile work environment during the time of plaintiff's work at the LCCF.
> . . . .
>
> The only claims open in the supplemental round are the two identified by the Magistrate Judge in the Report and Recommendation. All potential defenses, including without limitation defenses based on the failure to exhaust a hostile work environment claim, also remain open and unresolved.

---

[1]To put it in the vernacular, they had been left lying in the weeds, waiting to bite somebody on appeal. Plaintiff deserves to have these claims properly adjudicated.

Order Adopting Report and Recommendation, August 19, 2014 (docket no. 94); ID #2671.

Following this Order, both defendants have filed new dispositive motions. Both defendants contend Lake County is not a joint employer of plaintiff with Canteen; both defendants contend that plaintiff failed to present her hostile work environment claim to the EEOC before bringing it in this court, and Canteen further argues that it has not waived its defense of failure to exhaust administrative remedies in this regard; and both defendants contend that plaintiff's hostile work environment claim must fail because defendants took no adverse employment action against her. Further, Lake County contends plaintiff's claim that Lake County is a joint employer with Canteen is barred by the doctrine of collateral estoppel.

A Rule 12(b)(6) motion under the Federal Rules of Civil Procedure tests the sufficiency of a complaint; it is not designed to resolve the case on the merits. When determining whether to grant a 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true. A court must also draw all reasonable inferences in the plaintiff's favor. *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Circ. 1997). A complaint should be dismissed under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding,* 467 U.S. 69, 73 (1984). When matters are considered outside the pleadings, such motions have been treated as ones for summary judgment under Rule 56. Rule 12(d) Fed. R. Civ. Proc.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56. In considering a motion for summary judgment, the Court must view the evidence and show all reasonable inferences in favor of the non-moving party, here the plaintiff. *See Ziegler v. Aukerman,* 512 F.3d 777, 781

(6th Cir. 2008).  To defeat a properly supported summary judgment motion, the non-moving party must set out specific facts showing a genuine issue for trial.  Rule 56.

As noted, the charging document in this action is plaintiff's Second Amended Complaint (Second Amended Complaint or Complaint), docket no. 22, *supra,* notwithstanding defendants' occasional references to the earlier versions of plaintiff's complaint.  "A pleading that has been amended under Rule 15(a) supercedes the pleading it modifies and remains in effect throughout the action unless it is subsequently modified.  Once an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1476, pp. 636-38 (2010).  "It is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect."  *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000).  "[W]hen a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward" and "wipes away prior pleadings." *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999).  *See also B & H Medical, L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 268 n. 8 (6th Cir. 2008) ("a prior 'complaint is a nullity, because an amended complaint supercedes all prior complaints'") (*quoting Drake v. City of Detroit*, 2008 WL 482283 at *2 (6th Cir. Feb. 21, 2008); *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) ("Plaintiff's first amended complaint, not his original complaint, was the legally operative complaint . . .") (*citing In re Atlas Van Lines* and *Massey*).

In her Complaint, plaintiff Diane Cannon alleged that the two defendants, Canteen on one hand, and County of Lake, a municipal corporation acting on behalf of the Lake County

Sheriff (Lake County defendants) on the other, were joint employers, who both employed her. Complaint, ¶¶ 2, 3 and 28. Both defendants filed Answers to the Second Amended Complaint. See docket nos. 23 (Lake County Defendants) and docket no. 24 (Canteen).

There is no question that Ms. Cannon was an employee of defendant Canteen, but both defendants deny she was employed by Lake County. Indeed, as pointed out in the Report and Recommendation, Ms. Cannon was clearly an employee of Canteen, which was an independent contractor providing services to the Lake County facility. "Plaintiff did not contend she was actually employed by the Lake County defendants, but rather that the relationship between Canteen and the Lake County defendants was such that the jurors could find from the legal and contractual responsibilities of the two entities that both defendants could be treated as 'joint employers' of the plaintiff." Report and Recommendation, *supra,* at ID# 2599.

That being said, it was plaintiff's theory underlying this contention that defendants Canteen and Lake County had entered into a putative staffing relationship, wherein Canteen was acting as a temporary employment agency placing individuals like plaintiff in temporary jobs at its clients' places of business. This theory had been rejected by the EEOC, and it was rejected by this Court when it initially granted summary judgment to defendants. The Court has not changed its opinion regarding this theory. *See* Order Adopting Report and Recommendation, *supra,* at ID# 2670-71. What remains to be considered, because the parties did not address it before, is a distinctly separate theory referred to in the Report and Recommendation as the "joint employer doctrine."

As explained in the Report and Recommendation,

"The joint employer doctrine was recognized by the Supreme Court in *Boire v. Greyhound Corp.,* 376 U.S. 473 (1964), and has been clearly articulated in this circuit since the Sixth Circuit's decision in *Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990 (6th Cir.1997). The Court in *Swallows* began by noting that in instances where an employee might be answerable to more than one entity, dual concepts such as the "single employer" and the "joint employer" had arisen. The Court stated:

> 'Both the "single employer" and "joint employer" concepts developed in the labor relations context, *see Radio & Television Broad. Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed 2d 789 (1965) (per curiam)(single employer); *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) (joint employer), and were subsequently imported into the civil rights context. *See Armbruster v. Quinn,* 711 F.2d 1332, 1336-37 (6th Cir. 1983). Thus, we look to both labor cases and civil rights cases for guidance. *See Rivas,* 929 F.2d at 820 n. 15.'

*Swallows, supra,* at n.3. The Sixth Circuit went on to observe:

> 'As other Courts have explained, however, these concepts are analytically distinct. *See Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350, 1360 n. 6 (11th Cir.1994); *Rivas,* 929 F.2d at 820 n. 16; *NLRB v. Western Temp. Servs., Inc.,* 821 F.2d 1258, 1266 (7th Cir.1987); *Clinton's Ditch Coop. Co., Inc. v. NLRB,* 778 F.2d 132, 137 (2d Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); *NLRB v. Browning-Ferris Ind. of Pennsylvania, Inc.,* 691 F.2d 1117, 1122-23 (3d Cir.1982); *Magnuson v. Peak Technical Servs., Inc.,* 808 F.Supp. 500, 508-510 (E.D. Va.1992). While the single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise, the joint employer analysis has been described as follows:

> > **The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the**

6

> **business entities involved are in fact separate but
> that they share or co-determine those matters
> governing the essential terms and conditions of
> employment.** (emphasis added)

*Browning-Ferris*, 691 F.2d at 1123 (citations omitted).  *See also
EEOC v. Regency Windsor Management Co.*, 862 F.Supp. 189, 191
(W.D. Mich.1994).  Because plaintiffs have never raised the question
of whether TTU and Barnes & Noble acted as their "joint employer,"
we do not address the merits of such a claim here.


*Swallows, supra,* at n. 4. [FN2]

> "FN2. This was unfortunate because the situation in
> *Swallows* was somewhat analogous to the present
> case.  Barnes & Noble was an independent contractor
> which contracted with Tennessee Technological
> University ("TTU") to operate and manage a
> bookstore on TTU's campus. It was undisputed that
> Barnes & Noble, not TTU, was plaintiffs' direct
> employer, but when plaintiffs were discharged, they
> sought to hold TTU responsible as an employer as
> well.  Unfortunately for our purposes, since plaintiffs
> pursued the "single employer" theory, rather than the
> "joint employer" theory, the Court had no occasion to
> explore the parameters of the latter.]


"Here, plaintiff seeks to hold the Lake County defendants responsible as a
joint employer. . . [W]hether the Lake County defendants exercised sufficient control
to be deemed a joint employer is a question for the trier of fact.  *Equal Employment
Opportunity Comm. v. Regency Windsor Management Co.,* 862 F.Supp. 189, 191
(W.D. Mich. 1994); *see, Boire v. Greyhound Corp.,* 376 U.S. 473, 481 (1964)
(whether a company exercises such control as to be considered a joint employer is
a factual issue).  *See also, Carrier Corporation v. National Labor Relations Bd.,* 768
F.2d 778, 781 (6th Cir. 1985), citing *NLRB v. Browning-Ferris Industries of
Pennsylvia, Inc.,* 691 F.2d 1117, 1124 (3rd Cir. 1982) ("where two or more
employers exert significant control over the same employees – where from the
evidence it can be shown that they share or co-determine those matters governing
essential terms and conditions of employment – they constitute 'joint employers'
within the meaning of the NLRB.").

"There is no question here that Ms. Cannon ceased working at the county facility because of actions taken by the Jail Administrator, David Dagen, as this court noted in its Opinion of June 28, 2013.  On October 15, 2010, Mr. Dagen sent an email to Mr. Oliverius, Canteen's general manager, with various complaints about plaintiff's job performance, including one about delays of 20 to 30 minutes at meal time caused by plaintiff's inability to handle special diet trays.  He concluded by stating, "I do not want her back."  In his deposition, in response to a question by plaintiff's counsel as to whether he knew that as a result of the email he had sent to Mr. Oliverius, plaintiff would not be performing any more services for Canteen Services, Mr. Dagen testified:

> 'A.     She would no longer be allowed within the facility.'

Dagen Dep. at 38.  Asked, if that was his intent, why didn't he put that into his email, Dagen replied:

> 'I believe my intent is there when I said, 'I do not want her back.''"

*Id.* at 38-39.  Asked the reasons for not wanting plaintiff back, Dagen made it clear in his testimony that he was concerned with constant issues of food service which were being reported to him involving Ms. Cannon, including preparation of special diet trays, a prisoner who said plaintiff shoved him, and plaintiff snatching utensils out of a prisoner's hands.  *Id.* at 40-41.

"On the other hand, the jail administrator made it clear that the issue of security had nothing to do with his not wanting Ms. Cannon back.

> Plaintiff's Counsel:     Okay.  Would you agree that nowhere in that email did you ever talk about a security risk?
>
> A.     Correct.
>
> Q.     At some point in time the issue of security risk was raised, regarding her separation.
>
> . . .
>
> Plaintiff's counsel:     Do you understand the question?
>
> A.     Yes
>
> Q.     All right.  Can you answer the question?
>
> A.     Security risk never came out of my mouth at all.

> Q.    So are you saying that the issues that you raised in this
>       letter (sic) are the issues why you did not want her back?
>
> A.    Yes.
>
> Q.    No other reasons?
>
> A.    When you have constant issues with food service,
>       yes, there is a problem.

*Id.* at 39-40.

"The Sheriff (or presumably the jail administrator acting on behalf of the Sheriff) had the authority under the county's contract with the independent contractor, Canteen, to bar plaintiff from the facility if they believed her to be a security risk. *See* Food Services Contract at Part III.D. But Mr. Dagen's actions and testimony constituted persuasive evidence he barred her for other reasons in this instance, and that security concerns played no role. Instead, they simply decided to terminate plaintiff's employment at their facility based on her work performance, which, as a practical matter, any sheriff or jail administrator can do, because they have an inherent authority to regulate access to their jail facility.

"In doing so, it could be argued, and plaintiff does argue, that the Lake County defendants were disciplining Ms. Cannon, which is the function of an employer. Canteen, as her formal employer, unquestionably could discipline her if she displayed a careless, inefficient or unsatisfactory performance of her work responsibilities or duties, or conducted herself in any other way in which management, in its sole discretion, deemed to be inappropriate to the well being of the Company's operations or reflected poorly on the Company's business image. Canteen Employee Handbook, Part XVIII, ¶¶18, 23. But here, it was the Lake County defendants determining the need for corrective action, and taking that action, not Canteen.

"It is perhaps significant that the Lake County defendants, unhappy with the performance of an employee of their independent contractor, do not appear to have asked Canteen to handle the situation, but rather took matters directly into their own hands, by terminating plaintiff's continued employment at that work site. Because they were the "keeper of the keys," they had a particularly quick and effective way of shutting off plaintiff's access to the facility. But in electing to act on their own,

arguably for reasons of plaintiff's allegedly poor performance, did they thereby step into the shoes of the employer? [2]

"It can certainly be argued by the defendants that in most respects, the Lake County defendants did not stand in the shoes of an employer vis-a-vis plaintiff, as the Court has already found in its Opinion and Order, *supra*, although there may be some gray areas as far as her duties were concerned, which was not discussed. But does the "joint employer" doctrine require that one be a *de facto* employer in all respects for the theory to apply, or is the "joint employer" going to be held to the standards of an employer only where the questions of wrong-doing intersect, or touch upon, the areas where the defendant acted in the role of an employer? For example, if the theory were limited to the latter, which would make sense, plaintiff would have no grounds for alleging racial discrimination against the Lake County defendants in her wages or promotion, since there is no suggestion the County acted as a joint employer in these respects, but the Lake County defendants might be liable if they acted like an employer in disciplining her and if the reason they disciplined her, by terminating her from her employment at the jail, was really based on racial discrimination rather than poor performance.

"For the reasons discussed above, I find the claim of joint employer liability, as properly construed, viable in this case. Whether the Lake County defendants exercised sufficient control to be deemed a joint employer, however, is a question for the trier of fact, particularly where, as here, there appear to be genuine issues of material fact outstanding. This issue was not addressed nor ruled upon by the Court because the theory of joint employer liability previously raised was entirely different. I find the correct theory of joint employer liability remains to be addressed, and that a proper construction of that theory requires a disposition of the case at this time other than summary dismissal. *See* W.D. Mich. LCiv R 7.4. Since the Motion for Summary Judgment in favor of the Lake County defendants was essentially granted on the sole basis that there was no evidence the Lake County defendants directly

---

[2]Lake County defendants now complain that they are "compelled" to address the joint employer issue because the Report and Recommendation incorrectly concluded that their request to Canteen to not send plaintiff to work at the correctional facility was a "termination of employment" or "discipline." Lake County defendants say "[t]his simply is untrue and contradicted by the record." Docket No. 117-11, ID# 2877. To the contrary, the Report and Recommendation makes it abundantly clear that the actions of Lake County only led to plaintiff to cease working at the Lake County facility, not to her termination of employment with Canteen. The Report states this in detail on pages 4 and 5, noting in part, "Ms. Cannon refused to transfer because the other facility was in an adjacent county and she felt it was too far to drive. This cessation of her employment at the Lake County facility did not necessarily mean the end of her employment with Canteen, . . ." Again, at page 10, the Report states "[The sheriff and Mr. Dagen] simply decided to terminate plaintiff's employment at their facility. . ." (emphasis added). And again, at page 11, "The Lake County defendants might be liable if they acted like an employer in disciplining her and if the reason they disciplined her, by terminating her from her employment at the jail, . . ." (emphasis added)

10

employed plaintiff, I respectfully recommend that the Motion to Reconsider the Court's Order and Opinion of June 28, 2013 dismissing the claims against the Lake County defendants (docket no. 79) be **GRANTED,** and that the dismissal of the claims against the Lake County defendants be set aside."

Report and Recommendation, ID# 2600-07.

The Court adopted the Report and Recommendation. In its order, the Court did not ignore the general proposition that new theories are normally not entertained on motions for reconsideration, but decided that the under circumstances of this case "the better course of action is to refocus the case to permit explicit adjudication of these two claims identified" in the Report and Recommendation, and only those two claims, citing *Laster v. City of Kalamazoo,* 746 F.3d 714, 733-34 (6th Cir. 2014).

### Defendant Lake County's Contention: Plaintiff's Claim That She Was Co-Employed by Lake County Defendants is Barred by Doctrine of Collateral Estoppel

Defendant Lake County contends that the doctrine of collateral estoppel precludes re-litigation of plaintiff's claim that she was co-employed by the Lake County defendants. Lake County's Motion for Summary Judgment, docket no. 117, at ID# 2885-6. This argument is premised on the EEOC's dismissal and notice of right to sue letter of October 18, 2011, and a letter of even date from the investigator explaining why the investigation was being discontinued. *Id.,* Exhs. 1, 14.

However, the EEOC's notice only said that it was

"unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. <u>No finding is made as to any other issues that might be construed as having been raised by this charge.</u>" (emphasis added)

11

Exh. 1, *supra.*[3]

And far from being some sort of "valid final judgment," as defendant tries to contend, the right to sue latter made it abundantly clear plaintiff was free to

"file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court."  (emphasis added)

Exh. 1, *supra.*  This point was reiterated in the investigator's personal letter as well:

"You now have the right to pursue this matter in court on your own behalf."

Exh. 14, *supra.*

Defendant Lake County's argument is meritless.  The only authority cited in its five-sentence brief is *Chakan v. City of Detroit,* 998 F.Supp. 779 (E.D. Mich. 1998).  *Chakan* stands for the proposition that under the Full Faith and Credit Act, 28 U.S.C. § 1738, a final judgment in a State of Michigan court has the same preclusive effect in federal court as it would have in a State of Michigan court.  It says nothing about giving such deference to an investigation (much less, a discontinued one) of the EEOC, a federal administrative body.  Collateral estoppel principles are simply inapplicable to findings by federal agencies in the Title VII context.  *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 795-96 (1986); *Smith v. Perkins Board of Educ.,* 708 F.3d 821, 827 (6th Cir. 2013).

Lake County has confused the discontinuance of the EEOC investigation with a judicial adjudication made by a court, which it is not.  To the extent Lake County's dispositive motion seeks relief on this ground, I respectfully recommend it be **DENIED.**

---

[3]The investigator noted that plaintiff was an independent contractor. Exh. 14, *supra.*  Ironically, this is immaterial as to whether or not plaintiff was covered by the joint employer doctrine.  As discussed at length elsewhere, the doctrine presumes, and the undisputed facts show, that plaintiff was formally hired by Canteen to work at Lake County's facility.  No one has contended plaintiff was formally hired by Lake County.

12

## Defendants Contend that Lake County
## Was Not Plaintiff's Employer

Notwithstanding this Court's unmistakable guidance to the parties to explicitly address the joint employer doctrine recognized by the Supreme Court in *Boire v. Greyhound Corp., supra,* and articulated in this circuit in *Swallows v. Barnes & Noble Bookstores, Inc., supra,* as set out in the Report and Recommendation, neither defendant mentions the *Boire* or *Swallows* cases in their main briefs.  Of course, the whole reason this matter is back before the Court is because the parties skirted this issue the first time around.

Continuing to cite cases that have been decided by applying the single employer doctrine is not helpful.

> "The single-employer test, although sometimes confused with the joint employer test, asks 'whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities.' Unlike the joint-employer test, which focuses on the relationship between an employee and its two potential employers, the single-employer test focuses on the relationship between the two potential employers themselves.  When applying the single-employer test, courts generally weigh four factors:  interrelations of operations; common management; centralized control of labor relations; and common ownership and financial control.  The most important prong of the single-employer analysis is the centralized control of labor relations." [citations omitted]

*Branson v. Valu Merchandisers Company and Associated Wholesale Grocers, Inc.,* 2015 WL 437754 (D. Kan., Feb. 3, 2015).[4]

---

[4]The Sixth Circuit acknowledged in 1997 that its opinions had not always been entirely clear on the distinction between the concepts of "joint" and "single" employers.  *Swallows, supra,* at n. 4.

13

The basis of a joint employer finding on the theory to now be considered, as reiterated above, is simply that one employer (here, Lake County), while contracting in good faith with an otherwise independent company (here, plaintiff Canteen), has retained for itself sufficient control over one or more of the terms and conditions of employment of an employee (here, Cannon) who is employed by the other employer (Canteen). Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment. Indeed, sharing or co-determining only one such matter may be enough.

In *Mendez v. Puerto Rican International Companies, Inc.,* 2013 WL 5529755, (D. V.I., Oct. 7, 2013), an unpublished case cited by defendant Lake County, the Court points out that merely having the <u>authority to control who worked at its refinery</u> was sufficient alone to raise a genuine issue of material fact with respect to joint employer status.[5] Significantly, the *Mendez* court

---

[5]The *Mendez* court first set forth the joint employer doctrine discussed above:

> Under the doctrine of joint employers, where an employee is formally employed by one entity, but has 'been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity,' that employee may bring suit for 'violations of employment law [against] the constructive employer.' *Mendez v. Hovensa, LLC,* 49 V.I. 826, 834 (D. V.I. 2008) (quoting *Arculeo v. On Site Sales & Marketing, LLC,* 425 F.3d 193, 198 (2nd Cir. 2005)). 'The joint employer concept recognizes that the business entities involved are in fact separate [,] but that they share or co-determine those matters governing the essential terms and conditions of employment." *Mendez v.Hovensa,* 49 V.I. at 834 (quoting *N.L.R.B. v. Browning/Ferris Indus. of Penn., Inc.,* 691 F.2d 1117, 1123 (3rd Cir. 1982)). In other words, joint employer status may exist 'when two entities exercise significant control over [the same] employees].' *Graves v. Lowrey,* 117 F.3d 723, 727 (3rd Cir. 1997).

*Id.* at 5.

The court then proceeded to list such factors in considering control as hiring and firing; directly

stated that while a court could consider various factors in deciding whether the alleged joint employer had such control, it need not do so, observing:

> "In *Mendez* [*v. Hovensa*]*,* for example, the court found that the plaintiff had raised a genuine issue of material fact on the <u>sole</u> basis that the defendant had control over who worked in the refinery and who did not, and had *directed* the plaintiff's employer to terminate the plaintiff's employment. 49 V.I. at 834-36." (emphasis on "sole" added)

*Mendez v. Puerto Rican, supra* at 5.  (In *Hovensa,* plaintiffs who were working at the defendant's refinery suffered gastroenteritis after drinking from water barrels on the job, and were all hospitalized.  Although none of them worked for the defendant, the top management of the *Hovensa* refinery refused to allow them to speak to the media while they were hospitalized following this contamination incident, and then caused them to be terminated before their work was completed.)

All that being said, I find the approach taken by the Tenth Circuit in *Knitter v. Corvias Military Living, LLC, f/k/a Picerne Military Housing, LLC,* 758 F.3d 1214 (July 15, 2014), a case with facts remarkably similar to the present one, decided subsequent to the March 26, 2014 Report and Recommendation, to be sufficiently instructive that I am persuaded defendants must prevail on this issue.[6]  The Court in *Knitter* focuses on the vendor-client nature of the relationship between the plaintiff's employer and the defendant that underlies many of the situations where the joint employer test is applicable, i.e., a vendor will be providing a service for the benefit of the client

---

supervising employees, and administering disciplinary procedures; maintaining records; and participating in the collective bargaining process.  *Id.*

[6]Curiously, none of the parties mention this decision, although *Canteen* does cite the holding of the lower court, *Knitter v. Picerne Military Housing, LLC,* Case No. 11-1365-JWL (Kan.2013), 2013 U.S. District LEXIS 727.  Canteen Brief in Support of Motion for Summary Judgment, Docket no. 116, ID #2858.

and the nature of that service requires placing one of the vendor's employees (the subsequent plaintiff) on the client's property to perform that service.  Under these circumstances, there can always be tensions between the over-arching considerations a client will express, as to where, when and how things must be done on its property, and the labor, product, expertise and availability provided by the vendor's employee.  The mere fact that a client can request, or even compel, a vendor to remove a particular person from the client's premises – a right ultimately secured to any property owner – is not, without more, the exercise of the right of termination.  *Knitter* makes it clear that this is not enough to satisfy the joint employer test.

Defendant Picerne[7] was a property management company managing housing on various military installations, including Fort Riley, Kansas.  Lewis General Contracting, Inc. ("LGC") was a handyman company operated by its founder, Frank Lewis, which contracted to provide handyman services to help Picerne maintain its properties.  In fact, Picerne accounted for almost 100% of LGC's revenues.  *Id.* at 1219.

Plaintiff Lisa Knitter was employed by LGC as a handyman, which paid her and withheld her FICA taxes, and federal and Kansas income taxes.  Ms. Knitter received her assignments directly from Picerne's maintenance supervisors.  She completed these assignments on her own schedule.  She generally performed her work unsupervised, although it was subject to walk-through inspections by Picerne's supervisors.  *Id.* at 1220.

During the period of time she worked as a handyman at Fort Riley, Ms. Knitter made several complaints to  Picerne that she was being harassed and discriminated against because she was a woman.  *Id.* at 1222-3.  Eventually, Brian Lamb, the Assistant Director of Maintenance

---

[7]The defendant was previously known as Picerne.  That was the name used in the trial court and in the appellate decision, and accordingly is adopted here.

Operations at Picerne, called Mr. Lewis and asked him not to send Ms. Knitter to Fort Riley anymore.  He claimed she was uncooperative, untimely and had billed for work she had not performed.  After receiving the phone call from Mr. Lamb, Mr. Lewis terminated plaintiff's employment.  *Id.* at 1223. He testified he had no work assignments available outside of Fort Riley. Plaintiff Knitter subsequently filed a Title VII action against Picerne.  Plaintiff contended that Picerne effectively forced Mr. Lewis to let plaintiff go, because he did not have other clients for whom she could have worked (notwithstanding that it was uncontroverted that Picerne did not know that LGC did not have additional clients).

The district court granted summary judgment for Picerne, holding that plaintiff had not been employed by Picerne and therefore could not maintain a Title VII action against it.  *Id.* at 1224.  The Tenth Circuit affirmed.

The court of appeals began its analysis by explaining that the joint employer test is the appropriate test to use when an employee of one entity seeks to hold another entity liable as an employer.  *Id.* at 1227.  Under the joint employer test, two entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment. *Id.* at 1226.  "An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer within the scope of Title VII."  *Sizova v. Nat'l Inst. of Standards & Tech.,* 282 F.3d 1320, 1330 (10th Cir. 2002).  Most important to control over the terms and conditions of an employment relationship, according to the Tenth Circuit, was the right to terminate it under certain circumstances.  Additional factors courts consider in determining control under the joint employer test include the ability to promulgate work rules and assignments; set conditions of employment, including compensation,

benefits and hours; day-to-day supervision of employees, including discipline; and control of employee records including payroll, insurance, taxes and the like.  *Knitter, supra,* at 1226.

In this instance, the Tenth Circuit found that it should employ the joint employer test to determine whether a reasonable jury could find Picerne was Ms. Knitter's employer during the relevant period.  (No one alleged that Picerne and LGC constituted a single employer.) *Id.* at 1227-8.  The Tenth Circuit found she was not, noting that the evidence viewed in the light most favorable to the plaintiff did not show that Picerne had the authority to terminate her employment, that it did not pay her directly, and that it did not have the authority to supervise and discipline her "beyond the confines of a vendor-client relationship."  Taking all those factors together, the court concluded that Picerne treated Ms. Knitter as a vendor providing a service, rather than as an employee.  The Tenth Circuit noted that the case law provided limited instruction as to which terms and conditions of employment were considered essential for purposes of the joint employer test, although it was clear that the right to terminate was the most important factor, and while it found that although the ability to terminate may not be the sole factor courts should consider under the joint employer test, the question was particularly compelling there and weighed heavily against Ms. Knitter.  The court concluded that "no reasonable jury could find Picerne had the ability to terminate her employment." *Id.* at 1228; 1231.

As to Ms. Knitter's argument that Picerne was able to fire her because, by requesting that she no longer be sent to Fort Riley, Picerne effectively forced Mr. Lewis to terminate her employment, the court held that Picerne was unaware that all of LGC's business came from Picerne.  However, the court stated "[a]t any rate, Picerne lacked the power to fire Ms. Knitter; it at most could request that LGC no longer assign Ms. Knitter to work at Fort Riley."  Picerne testified that

it did not have the power to fire vendor handymen and instead was required to direct issues with handymen to the vendor companies.  *Id.* at 1228-9.  In Ms. Knitter's case, Mr. Lamb spoke to Mr. Lewis and requested that LGC no longer send plaintiff to Fort Riley.  He said nothing regarding Ms. Knitter's continued LGC employment or her ability to work for other LGC clients.  The court stated "[t]here is therefore no genuine dispute that control over the most important condition of Ms. Knitter's employment under the joint employer test – the ability to terminate her engagement – lay solely with LGC.  Picerne did not share in this power as a joint employer." *Id.* at 1229.

The Court also addressed the other factors such as Ms. Knitter's pay and supervision, among other things.  It noted that plaintiff's pay, payroll and other records were handled by LGC. Picerne's supervision was limited to directing the plaintiff on how to perform certain tasks to its satisfaction and was at a level consistent with a client-vendor relationship and not an employer-employee relationship.  The modicum of control Picerne exerted over plaintiff's daily work did not suffice to render it a joint employer for Title VII purposes.  LGC was a vendor and Picerne was a client.  Picerne exerted the sort of control over LGC handymen that one would expect a client to exert over its vendors – supervising limited aspects of their work, and providing them with instruction on particular tasks and furnishing supplies when necessary.  Such vendors did not become employees of Picerne for Title VII purposes under these circumstances, and Ms. Knitter had not offered sufficient facts for a reasonable jury to find that Picerne was her joint employer rather than a client of LGC.  *Id.* at 1229-31.

For these reasons, the appellate court affirmed the trial court's grant of summary judgment, holding that to the extent plaintiff faced discrimination or harassment at her job, Title VII

19

did not furnish her with a remedy against Picerne because it was not her "employer" within the meaning of the statute. *Id.*

In the present case, the Court does not need to reach the reason Lake County exercised its authority to bar plaintiff from the jail – e.g., whether it was performance, or racially motivated, or for security – until it is first determined she was an employee under the joint employer test. She was not. This case is remarkably similar to *Knitter*, and while there will be some minor factual differences, it is evident that no reasonable jury could find the relationship between Canteen and Cannon on one hand, and Lake County on the other hand, to be other than vendor and client.[8] Lake County was aware plaintiff was not their employee, and they knew they had no control over what happened to her. *See* Dep. of David Dagen, 37-38. Thus, despite Lake County's dissatisfaction with Canteen's employee, Lake County nevertheless negotiated with the vendor as to plaintiff's last day. Deposition of Pam Bower, 32-34. But ultimately, a client will virtually always have the last word as to who works on its property (jail or no jail). The facts of this case have now been spread over several opinions and numerous briefs; there is nothing to support a finding this was not a classic vendor-client relationship.

Therefore, I respectfully recommend that defendant Lake County's motion for summary judgment be **GRANTED** based on this issue.

---

[8]For this reason, it is unnecessary to consider the County's contention that the feeding of inmates was a security concern, thus bringing Dagen's action within the scope of the contract provision which allows the sheriff to bar anyone who was a security risk. In any event, this was a particularly weak argument. If the drafters of the contract (one assumes the county, but it does not really matter) had thought the word security was that all-encompassing, presumably they would have said so. And Mr. Dagen himself demolishes this argument. In his deposition, he could not have been plainer when he said he was not at all concerned about plaintiff being a security risk (Dagen Dep., 39-40).

**Defendants Contend Plaintiff's Hostile Work**
**Environment Claim Should Be Dismissed**
**Because Defendants Took No Legally**
**Adverse Employment Action Against Her[9]**

Lake County contends that plaintiff's hostile work environment claim should be dismissed because the Lake County defendants "took no legally adverse employment action against her." This argument is based on defendants' claim "that the County staff . . . were not co-workers, much less, supervisors of plaintiff." Defendant Lake County's Brief (docket no. 117) at 21. Defendant then cites a number of cases from the Sixth Circuit pointing out that plaintiff must show a 'tangible employment action' to support a Title VII claim, *see Burlington Indus., Inc. v Ellerth,* 524 U.S. 742, 761 (1998); that *de minimis* employment actions are not actionable under Title VII, *see Bowman v Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir. 2004), and that "[i]f every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure," citing *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir. 1999).

Unfortunately, defendant ignores the elephant in the middle of the room. In stating that it took 'no legally adverse employment action against' plaintiff, Lake County fails to mention, much less discuss, that it unilaterally stopped plaintiff's employment at the Lake County facility. Telling an employee (if she was an employee) that she was barred from returning to her place of

---

[9]Assuming Lake County is granted summary judgment because it was not plaintiff's joint employer, the Court need not reach this issue. In the event Lake County is denied summary judgment on the joint employer issue, I have also analyzed this issue for the Court.

employment, when she was offered nothing in return, was certainly an adverse employment action (and somewhat more significant than a displeased facial expression).[10]

Moreover, in stating that the county staff "were not, and should not be considered to be, supervisors of plaintiff," who worked in the Lake County's RRP kitchen facility, defendant fails to explain the Food Services Contract (Contract).  Exh. 5, Lake County's Motion, docket 117-6.  Paragraph VI.A. of the Contract states that "[t]he Jail Administrator [David Dagen] will be solely responsible for the jail kitchen."  That provision would certainly seem to make Dagen the plaintiff's supervisor.  At the least, it would require an explanation.  Indeed, if Dagen were not plaintiff's ultimate supervisor in charge of the kitchen, one might reasonably question in what capacity he was acting when he terminated plaintiff's presence there, because of "constant issues with food service."  Dagen Dep. at 40.

For the reasons stated, I find no merit in Lake County's contention on this issue.

---

[10]The elephant is not a concern for Canteen.  It has been clear from the beginning that plaintiff's removal from the Lake County facility was the unilateral decision of the Lake County defendants.  Plaintiff viewed Canteen as being as helpless as she was to prevent it.  *Please see discussion regarding the 20 pages of notes plaintiff submitted to the EEOC in the last section of this Report and Recommendation, infra.*

To the extent, Canteen alleges that plaintiff suffered no adverse employment action and therefore has never alleged a *prima facie* claim of a hostile work environment, it concedes it is offering this argument at this time "to preserve its rights."  Docket no. 116, ID #2852.  The Court previous addressed this issue at length in the earlier Report and Recommendation, finding that plaintiff had set forth a separate claim of a hostile work environment in her complaint, and that there was support for that claim.  *See* docket no. 86, ID #2607-21.  It is not necessary to repeat that discussion here.

**Plaintiff's Contention that Canteen Waived
Its Defense of Failure to Exhaust Administrative
Remedies in its Answer to Plaintiff's Complaint**

On October 9, 2012, plaintiff filed her Second Amended Complaint which, as noted, superseded her previous Complaints.  Shortly thereafter Canteen filed its answer to the Second Amended Complaint on October 24, 2012 (docket no. 24).[11]

There are two paragraphs in the Complaint relevant to the issue of whether Canteen waived the defense that plaintiff failed to exhaust her administrative remedies at the EEOC. Paragraph 8 states that "[t]he plaintiff has exhausted all her remedies through the Equal Opportunity Employment Commission."  Canteen responded in its Answer that it "neither admitted nor denied as defendant Canteen is without knowledge or information sufficient to form a belief or opinion as to the truth to the allegation in Paragraph 8."

In paragraph 31 of the Complaint, plaintiff states "these [referring to statements made by plaintiff's supervisor as set forth in paragraph 30 of the Complaint] and other additional acts of discrimination were alleged in the EEOC investigation and the Plaintiff incorporates those herein by reference, from the exhaustion of remedies part of the case."  Defendant Canteen answered that it "neither admitted nor denied as Defendant is without knowledge or information sufficient to form a belief or opinion as to what allegations were made in the EEOC investigation." (emphasis added)

Clearly, defendant Canteen did not waive, in the Answer it filed to Plaintiff's Second Amended Complaint, any defense it had to plaintiff's failure to exhaust her administrative remedies at the EEOC.

---

[11]This was Canteen's Second Answer.  Defendant Canteen did not file an answer to the initial complaint.

Defendant Canteen had responded somewhat differently in its response to Plaintiff's First Amended Complaint.  There it gave the same response to paragraph 31, but in response to paragraph 8, it gave the response, "Admitted."  I find that this admission was properly superceded by defendant's  Second Answer, which defendant was entitled to file when plaintiff elected to file her Second Amended Complaint.  But to the extent that defendant's answer to paragraph 8 of the First Amended Complaint survives defendant's revised response to paragraph 8 in its second Answer, this is at most an acknowledgment by defendant that plaintiff took her case to the EEOC.  Defendant is unequivocal in its answers to paragraph 31 in both complaints, that it did not know what allegations were made during the EEOC investigation.  Reading paragraphs 8 and 3 in tandem, as we in fairness must, since they are part of the same Answer, there is no waiver here of Canteen's affirmative defense as to the sufficiency of plaintiff's hostile work environment claim made at the EEOC.

I find no basis to preclude defendant Canteen from raising its defense that plaintiff failed to exhaust her administrative remedies as to a hostile work environment.

**Both Defendants Contend Plaintiff's Hostile
Work Environment Claim Against Lake County
Should Be Dismissed Because Plaintiff Failed to Bring
This Charge Before the Equal Employment
Opportunity Commission[12]**

Both defendants contend that plaintiff failed to allege a hostile work environment when she filed her race discrimination claim with the EEOC, prior to bringing this action in federal court. Both defendants cite the Sixth Circuit's opinion in *Younis v. Pinnacle Airlines,* 610 F.3d 359 (2010). In *Younis,* the plaintiff filed an employment discrimination complaint against the employer with the EEOC, based on his religion and national origin. The complaint alleged only a few discrete acts of discrimination based on plaintiff's religion and national origin. These were limited to three or four isolated comments by plaintiff's peers over a three-year span of time. Plaintiff did not allege a hostile work environment. After receiving a right-to-sue notice, plaintiff filed a federal lawsuit for wrongful termination based upon, among other things, a claim of a hostile work environment.

While upholding the district court's decision that the plaintiff had failed to exhaust his administrative remedies by not including his hostile work environment claim in his EEOC charge, the Sixth Circuit provided valuable guidance on the application of the administrative exhaustion rule, indicating that a decision about whether a hostile work environment claim has been stated is fact-based and not driven simply by labels. The *Younis* court stated at 361-362:

> The [administrative] charge must be "sufficiently precise to identify the parties, and
> to describe generally the action or practice complained of." 29 C.F.R. § 1601.12(b).
> As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not

---

[12]If defendant Lake County prevails on its summary judgment motion that it was not a joint employer, *supra,* it is not necessary for the Court to determine plaintiff's hostile work environment claim against the County, since the County was not her employer.

For reasons stated at the conclusion of this section, I find there was no hostile work environment claim made against defendant Canteen at the EEOC.

included in his EEOC charge.  *See* 42 U.S.C. § 2000-5(f)(1); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).  This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation and persuasion.  *See, Id.* at 44.  94 S.Ct. 1011.  Hence, allowing a Title VII action to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role.  <u>At the same time, because aggrieved employees – and not attorneys – usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge.</u>  *See, Randolph v. Ohio Dept. of Youth Servs,* 453 F.3d 724, 732 (6th Cir. 2006)."  (emphasis added)

     The Court then held that

"[i]n order to establish a claim of hostile work environment, . . . a plaintiff must present evidence of harassment that 'unreasonably interfer[es] with [his] work performance and create an objectively intimidating, hostile, or offensive work environment.'  *Grace v. USCAR,* 521 F.3d 655, 678 (6th Cir. 2008).  As a result, we have suggested in several unreported cases that the inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion [citations omitted].  We now hold that such evidence, cited in an EEOC charge to support a claim of disparate treatment, will not also support a subsequent uncharged, uncharged claim of hostile work environment "unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge."  *Cheek v. W &S. Life Ins. Co.,* 31 F.3d 497, 503 (7th Cir. 1994) (hostile-work-environment claim based on sexual harassment cannot be reasonably inferred from allegations of sex discrimination in plaintiff's EEOC charge); *see also, Chacko v. Patuxent Inst.,* 429 F.3d 505, 511 (4th Cir. 2005) ("The sharp differences between [the] evidence [presented at trial] and the allegations in [the plaintiff's] administrative charges compel the conclusion that he failed to exhaust his administrative remedies.")

*Id.* at 362.

     It is apparent, then, that it is the task of this court to look at what plaintiff presented in her EEOC charge, and decide if those claims generally describe the actions or practices complained of in her Second Amendment complaint regarding a hostile work environment, or

whether the latter "are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.*

Defendant Canteen claims they do not, setting forth what it believes to be the entirety of plaintiff's EEOC charge, to wit:

> My employment with the above named employer [Canteen] began in July 2010.  I was last employed as a Supervisor.
>
> On October 16, 2010, the stove blew up at the facility I was assigned to.  Once everything was cleared my boss came in and said she needed to speak with me.  She informed me that the Sheriff had instructed her to terminate me.  When I asked for what reason she said she didn't know.  The Sheriff had only stated that he did not like my attitude after the stove blew up.  I was the only black employee in the kitchen.
>
> I believe I was terminated due to my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended.  (Doc. #38-4, Page ID #666.)

Canteen Reply Brief, Docket No. 123 at 3, ID #3305.

If this were, in fact, the extent of plaintiff's submission to the EEOC, I would agree with defendant.  There is no basis in this short charge from which to derive a claim of a hostile work environment.

Unfortunately, the situation is not that simple.  Plaintiff also submitted to the EEOC 20 single-spaced pages detailing the various employment difficulties she experienced while employed at the jail.[13]  Plaintiff randomly signed some of these statements, and dated one of them November 10, 2010, less than one month after she was barred from working at the Lake County facility.

---

[13]These notes were not filed as part of this motion.  Rather, they are attached as Exhibit A to the Reply Briefs (docket nos. 125, 126) to plaintiff's two most recent motions for partial summary judgment.

It would appear these statements must be considered part of the charge plaintiff submitted to the EEOC, since she was proceeding *pro se* and at least a portion of the statements were dated within one month of her termination.  Even if these statements were not submitted along with the original charge, the regulations are lenient in allowing a charge to be amended to, *inter alia,* "amplify allegations made therein," and to also allow "amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge."  29 C.F.R. §1601.12(b).  All of these amendments relate back to the date the charge of racial discrimination was first received.  *Id.*

Defendant Canteen's failure to address plaintiff's 20 pages of statements to the EEOC renders its brief inapposite.  Canteen correctly states the law on this issue (*see* defendant Canteen's Brief, docket no. 123, ¶ C.1.), but applies it only to the original three-paragraph charge plaintiff brought before the EEOC.  Canteen's brief does not address the 20 pages of statements that plaintiff also filed.[14]

Defendant Lake County, on the other hand, does not contest the sufficiency of plaintiff's charge before  the EEOC at all.  Instead, Lake County takes the position that plaintiff does not dispute that she failed to bring her claim before the EEOC, and says that plaintiff has argued instead that the Sixth Circuit has abolished this exhaustion requirement.  Defendant Lake County's Reply Brief, docket no. 124, ID #3325, *et seq.*

Defendant Lake County is correct that plaintiff contends the Sixth Circuit has abolished the EEOC exhaustion requirement.  Plaintiff's argument is specious and the undersigned recommended it be rejected in a previous Report and Recommendation filed May 22, 2015, docket

---

[14]Canteen may not have been aware of them.

no. 134.[15]  Defendant Lake County is incorrect, however, when it states that "[p]laintiff does not

dispute that she failed to bring her claim before the EEOC."  Defendant Lake County's Reply Brief,

docket no. 124, ID #3325.  To the contrary, plaintiff states:

> ". . . not only has the Plaintiff 'checked the box for the race
> discrimination,' the facts contained in the twenty pages of accusations
> submitted by the Plaintiff to the EEOC as part of the investigation are
> sufficient to demonstrate that she at the least, 'recited facts alluding to
> a race claim' as well as a hostile environment and discrete adverse
> action theory of recovery.  See Exhibit A, Cannon Letters to the
> EEOC [attached to docket no. 126]."

Plaintiff's Reply Brief to Lake County's Response to Plaintiff's Motion for Partial Summary

Judgment, docket no. 126,  ID# 3435-6.[16]

The 20 pages of notes raise some questions themselves. There is a surprising paucity

of references in plaintiff's 20 pages of notes to the EEOC about how plaintiff was treated because

of her race, or the impact race had on her working environment.  In fact, she mentions race at all only

three times.  First, plaintiff said she and her supervisor, Pam, talked about how Chief Deputy Dagen

"would not hire certain people because of their race," and about how he and his wife, a sergeant,

looked down on blacks.

In a second instance, plaintiff complains that a

> "Sergeant Vanroy was always trying to find me at fault for
> something.  She was known to just walk into the kitchen as though she
> was doing a patrol.  All of the inmates and I knew that if she thought
> we had made a sudden wrong move we would be written up on the
> spot and no questions would be asked of any of us."

Plaintiff goes on:

---

[15]No objection has been filed to this Report and Recommendation to date.

[16]Unfortunately, but not surprising in this case, plaintiff's argument and exhibit are contained in a
related motion rather than the pending one.

> "Once, when a white inmate Dan lied about me giving him permission to be in the kitchen . . . Sgt. Vanroy stated that the inmate had never lied to her before."

Nothing further came of this exchange.

Third, plaintiff states that besides one officer, she was the only black employee in the facility.  She said she thought the officer was not treated as justly as the other officers, but gives no explanation.

Aside from these *de minimis* references to race, plaintiff's 20 pages of notes consist of a litany of work place complaints, where plaintiff described she felt she was being treated unfairly for a variety of reasons.  But these pages are curiously devoid of references to the fact that plaintiff was black.  There is no claim at all that anyone used the "N" word, either to plaintiff's face or behind her back, as was alluded to in her Complaint and stated at length in her affidavit of July 11, 2013.  Nor does she claim that she explicitly complained to her supervisor Pam about the unfavorable racially discriminatory treatment she received from Mrs. Dagen and the inmates she later recites in her Complaint.

The lack of significant mention of race in the 20 pages of written narrative might, without more, be enough for the Court to conclude that these statements were nothing more than the collected complaints of an unhappy employee who thought she was not liked, that other employees and superiors were out "to get her," that she was being treated unfairly, etc., i.e., the usual litany of shop grievances, justified or not, so common to the work place, and not necessarily based at all on her race.  The law usually demands some *indicia* of unconstitutional discrimination before these cases may proceed further.

But plaintiff's statements did not arise in a vacuum.  Plaintiff specifically brought a charge to the EEOC alleging she was being discriminated against because of her race.  When her

statements are viewed against that backdrop, liberally so since she was not an attorney, one can arguably see she is listing incidents she believes were racially motivated, without using a tag line at the end of each paragraph saying, ". . . and this was done to me because I am black!"[17]  Taken together, I find these incidents allege evidence of racial harassment which would have unreasonably interfered with plaintiff's work performance and which would have created an objectively intimidating, hostile or offensive environment, at least sufficient to defeat a motion for summary judgment.  *See, Younis, supra.*

   I do not find, however, any allegation at the EEOC level that this hostile work environment was created by Canteen.  Indeed, plaintiff's statement near the end of the 20 pages appears to negate any suggestion plaintiff was attempting to set out a claim of a hostile work environment claim against Canteen.  On the next-to-the-last of the 20 pages plaintiff submitted to the EEOC, she says the following (in her own words):

<blockquote>

About my Canteen boss Pam Bower

Pam Bower has always been fair towards me.  When one of the canteen workers Kat who's husband is also a officer (guard) at our sight came in drunk oneday and used profane language towards me in front of the inmates and Pam. - Pam reminded the higher ups that I did not swear back at her Pam commented me later for staying calm through the whole thing.  Pam did see to it that Kat was fired.

Almost every other day Pam was in Dagon's office always taking up for me.  Pam offen Reminded the others that my training was no different then anyone else.  Canteen offen reminded the workers that they made constant major mistakes,

Canteen was very sad to see me go but, still there was nothing that they could do about it.

</blockquote>

---

[17]This is not unlike a church hymnal, wherein each verse of a song is printed, but the refrain following each verse is printed only one time.

Pam Bower was plaintiff's Canteen supervisor on the premises.  It is clear from reading the 20 pages of statements, that when plaintiff had difficulty, she would turn to Pam who would assist her in every way possible (as she did in getting Kat fired).  The 20 pages essentially chronicle difficulties plaintiff had with officers and employees of the County, and the inmates.  There is no suggestion that Canteen, as an organization or acting through its supervisor Pam Bower, had anything to do with a hostile environment, except perhaps to try to alleviate it.  Therefore, presuming, *arguendo,* that a hostile environment based on race has been set out in this 20-page statement, it is one that lies at the feet of the Lake County defendants and was not the fault of the defendant contractor, Canteen.

Accordingly, I respectfully recommend that defendant Lake County's motion for summary judgment, to the extent it is based upon plaintiff's purported failure to bring her Title VII hostile work environment claim before the EEOC, be **DENIED.**  I further recommend that defendant Canteen's motion for summary judgment, based on plaintiff's failure to allege a hostile work environment against it at the EEOC, be **GRANTED.**

### Recommendation

For the reasons discussed in the preceding sections, I respectfully recommend the dispositive motions of both defendants (docket nos. 115 and 117, respectively) be **GRANTED.**

Dated:  July 23, 2015                                    /s/ Hugh W. Brenneman, Jr.
                                                                    HUGH W. BRENNEMAN, JR.
                                                                    United States Magistrate Judge

32

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).